```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION
```

AVIALL SERVICES, INC., §
 §
    Plaintiff- §
    counterdefendant, §
 § Civil Action No. 3:97-CV-1926-D
VS. §
 §
COOPER INDUSTRIES, LLC, §
 §
    Defendant- §
    counterplaintiff. §

## MEMORANDUM OPINION AND ORDER

The court revisits this case to address liability issues under § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, that the court in *Aviall Services, Inc. v. Cooper Industries, LLC*, 572 F.Supp.2d 676 (N.D. Tex. 2008) (Fitzwater, C.J.) ("*Aviall III*"), deferred for decision on consideration of supplemental briefs. At issue is whether plaintiff Aviall Services, Inc. ("Aviall"), a land purchaser, has established the liability of defendant Cooper Industries, LLC) ("Cooper"), the seller, for cost recovery under CERCLA § 107(a) as to remedial investigation costs that Aviall incurred at the Love Field Facility ("Love Field") for the period March 1996 through February 1997, and as to response costs incurred at the Carter Field Facility ("Carter Field"). For the reasons that follow, the court holds that Aviall is not entitled to recover the Love Field remedial investigation costs, that it is entitled to recover response costs incurred at Carter Field, and that the

question of compliance with the national contingency plan ("NCP") in cleaning up Carter Field remains to be decided at trial.

I

The relevant background facts and extensive procedural history of this case are set out in *Aviall III* and need not be repeated at length. *See Aviall III*, 572 F.Supp.2d at 682-85. The court will recount only the procedural history and pertinent holdings of *Aviall III* that are necessary to frame the questions decided in today's opinion.

Cooper seeks summary judgment dismissing Aviall's CERCLA § 107(a) cost recovery action on the basis that Aviall seeks cleanup costs that are not consistent with the NCP. "[C]onsistency with the NCP is a peculiarly fact intensive question that can normally only be determined at trial, or at least after a full pretrial record has been prepared." *Id.* at 688 (internal quotation marks omitted) (quoting *Buffalo Color Corp. v. AlliedSignal, Inc.*, 139 F.Supp.2d 409, 418 (W.D.N.Y. 2001)). "[C]ourts have typically bifurcated the issues of liability and damages, enabling a plaintiff to obtain summary judgment on the liability issue while reserving for trial the issue of which damages are recoverable—which includes questions of necessity and consistency with the NCP." *Id.* (citing *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 667-68 (5th Cir. 1989)). But notwithstanding how a § 107(a) cost recovery action is typically adjudicated, a defendant can

secure dismissal of the entire claim when there is no genuine question of fact that the plaintiff failed to substantially comply with the NCP. *See id.* at 689 ("The mere fact that a plaintiff, without proving NCP compliance, can prevail on its own motion for partial summary judgment does not mean that a defendant is precluded from obtaining summary judgment dismissing the entire claim when there is no genuine question of fact that NCP compliance is lacking."). Therefore, in *Aviall III* the court granted summary judgment in Cooper's favor in those instances where a reasonable trier of fact could only find that Aviall had failed to substantially comply with the NCP's public participation requirement. *See, e.g., id.* at 697-98 (addressing investigatory costs at the Forest Park Facility ("Forest Park")).

The court was unable, however, to decide on the parties' briefing whether either side was entitled to summary judgment regarding Aviall's claims for cost recovery as to remedial investigation costs incurred at Love Field for the period March 1996 through February 1997, or as to response costs incurred at Carter Field. *Id.* at 698 (Carter Field) and 699 (Love Field). In *Aviall III* the court adopted as one component of the test for substantial compliance with the NCP the requirement that "parties who might foreseeably be affected by the private party's decisions must be given a meaningful opportunity to participate in them." *Id.* at 693. The parties' briefing did not adequately address this

issue with respect to Aviall's Love Field remedial investigation costs for March 1996 through February 1997, and its Carter Field response costs. These issues remain to be decided today.[1]

As the court explained in *Aviall III*, the parties' respective summary judgment burdens are as follows. "Because Aviall will bear the burden at trial of proving NCP compliance, Cooper can move for summary judgment by pointing the court to the absence of evidence of such compliance. If the summary judgment evidence that Aviall produces (viewed favorably to Aviall) is insufficient to establish NCP compliance, Cooper is entitled to summary judgment." *Id.* at 689 (citing cases). Aviall seeks partial summary judgment establishing that Cooper is liable under CERCLA § 107(a). "Because Aviall will bear the burden of proof at trial on this claim, to obtain summary judgment, it must establish beyond peradventure all of the essential elements of the claim." *Id.* at 700 (internal quotation marks and brackets omitted) (quoting cases). "This court has noted that the 'beyond peradventure' standard is 'heavy.'" *Id.* (quoting case).

---

[1]In its supplemental briefing, Cooper also seeks summary judgment as to removal costs that Aviall incurred at Love Field in 1993. Because this issue is beyond the scope of supplemental briefing ordered in *Aviall III*, the court will not address it.

II

The court first considers Aviall's remedial investigation costs at Love Field.

A

The Love Field property is located "on the northwest side of Dallas Love Field approximately 450 feet southeast of Bachman Lake." P. App. 5290. Aviall discovered chlorinated solvent groundwater contamination at Love Field through the February 1996 due diligence assessment of MLT Development Company, ("MLT"), which owned a nearby land parcel and later purchased part of the Love Field property from Aviall. In March 1996 Aviall notified the Texas Natural Resource Conservation Commission ("TNRC") of the contamination.[2] Then, between March 1996 and February 1997, Aviall conducted a remedial investigation. To determine the extent of contamination, Aviall sought permission to install monitoring wells and sample groundwater on nearby land owned by the following entities: MLT, City of Dallas Aviation Department ("Dallas Aviation"), and City of Dallas Parks and Recreation Department ("Dallas Parks/Recreation") (which owned Bachman Lake Park). Aviall forwarded to these landowners the results of its investigative activities on their properties. Also, Aviall communicated with Cooper and Greenwich Air Services, Inc.

---

[2]The TNRC is now the Texas Commission on Environmental Quality. The court will refer to it as the TNRC, by which it was known at times pertinent to this litigation.

("Greenwich"), another subsequent purchaser of part of the Love Field property, regarding the Love Field investigation and remediation issues. Aviall's investigation culminated in a May 1997 Groundwater Monitoring and Sampling and Analysis Plan ("groundwater monitoring plan") and a June 1997 Remedial Investigation and Groundwater Monitoring Report ("remedial investigation report"), which Aviall provided to the TNRC, Dallas Aviation, Dallas Parks/Recreation, and Greenwich. In October 1997 Aviall enrolled the Love Field site in the TNRC's Voluntary Cleanup Program ("Cleanup Program") and proceeded to undertake remediation subject to the TNRC's oversight. In November 1997, as required by the Cleanup Program, Aviall notified 12 other nearby landowners, who were located downgradient of Love Field to the north or northwest and roughly between Love Field and Bachman Lake, that contamination potentially had migrated onto their properties. In 1999 Aviall began publishing newspaper notices regarding the ongoing cleanup at Love Field.

B

Aviall and Cooper dispute whether Aviall provided all foreseeably affected parties with a meaningful opportunity to participate in the Love Field remedial investigation. The core of the controversy lies in how to delimit the scope of foreseeably affected parties.

Aviall maintains that MLT, Dallas Aviation, Dallas

Parks/Recreation, Greenwich, and Cooper were the only parties foreseeably affected by the remedial investigation. Aviall contends that the other nearby landowners had a merely "speculative" interest and that they "foreseeably could have a real interest in Aviall's groundwater delineation only after confirmation that their properties were likely to be contaminated." P. Supp. Br. 6.

Cooper counters that Aviall excluded from the remedial investigation two discrete categories of foreseeably affected parties: the 12 downgradient landowners whom Aviall first contacted in November 1997, and recreational users of Bachman Lake, who learned of the response action through the 1999 newspaper notices. Cooper maintains that Aviall discovered early in the investigation that the gradient of the Love Field groundwater was toward the north or northwest—in the direction of the 12 landowners and Bachman Lake. Cooper further asserts that the investigation revealed that contaminants had in fact migrated to downgradient properties and the area around Bachman Lake long before Aviall notified the landowners or lake users. This dilatory notice, Cooper argues, denied these foreseeably-affected parties a meaningful opportunity to comment on Aviall's investigatory decisions.

C

1

Because it is undisputed that Aviall did not notify the 12 downgradient landowners or recreational lake users until after the completion of its remedial investigation, the dispositive question is whether a reasonable trier of fact could find that either group was foreseeably affected by the remedial investigation.[3] The court first considers the 12 landowners.

A brief review of the remedial investigation as it pertains to Bachman Lake is instructive in determining when the landowners became foreseeably affected. In November 1996 Aviall conducted investigative activities at Bachman Lake Park, and it transmitted the results to Dallas Parks/Recreation in a January 1997 letter. D. App. 147 (groundwater monitoring plan); P. App. 5449-51 (January 1997 letter to Dallas Parks/Recreation). Aviall described the presence of particular groundwater contaminants, stated that Aviall had "determined the apparent extent of contamination of the

---

[3]This is a constituent question of fact within the mixed question of law and fact of substantial compliance with the NCP. "Whether a party has substantially complied with the NCP is a mixed question of law and fact. This means that, once the factual details regarding Aviall's cleanup efforts have been established, the court decides—as a matter of law—whether those efforts substantially comply with the NCP." *Aviall III*, 572 F.Supp.2d at 695. The question whether either group was foreseeably affected by the remedial investigation is one of fact. If a reasonable trier of fact could only find, however, that a group was (or was not) foreseeably affected, it is not a *genuine* issue of fact that precludes granting summary judgment.

groundwater for this area," and proposed future monitoring of groundwater conditions.  P. App. 5449-50.  In February 1997 monitoring activities were conducted at Bachman Lake Park.  D. App. 148.  Further, according to the groundwater monitoring plan, February 1997 studies demonstrated that the groundwater "gradient trended to the north and northwest toward Bachman Lake."  D. App. 151-52.  The remedial investigation report confirms the existence of two contaminant plumes that are "bounded to the northwest by Bachman Lake."  P. App. 5310.

Based on the foregoing evidence, a reasonable trier of fact could only find that, no later than early 1997, the 12 downgradient landowners were foreseeably affected by the contamination emanating from Love Field.  Specifically, because by February 1997 Aviall's investigation had uncovered the existence of contaminants at Bachman Lake Park and demonstrated that Love Field's contaminated groundwater tended to flow to the north or northwest—toward the 12 landowners and the lake—Aviall knew or had reason to know that contamination likely had already reached these properties. "[S]omeone whose property has been contaminated" is a party foreseeably affected by cleanup efforts. *Aviall III*, 572 F.Supp.2d at 696.  Yet Aviall waited nearly nine months, and completed its remedial investigation, before it notified these landowners of the potential contamination.

Aviall asserts that it notified the downgradient landowners

when "it became reasonably clear that the contamination likely had affected their properties," P. Supp. Resp. Br. 3, but it neither explains, nor points to any evidence that suggests, why it was not until November 1997 that this became reasonably clear. A reasonable trier of fact could therefore only find that Aviall's November 1997 notice failed to provide the 12 foreseeably-affected downgradient landowners a meaningful opportunity to participate in the Love Field remedial investigation.

2

This conclusion is not altered by Aviall's bipartite contention that it provided the landowners a meaningful opportunity to protect their interests despite their tardy notification. First, Aviall points to the offer that it made to each landowner to obtain at its own expense a certificate from the TNRC's Innocent Owner's Program ("IOP") that would relieve the landowner of personal liability for any contamination. Aviall contends that these certificates ensured that downgradient properties would not lose market value due to contamination, and it cites an expert article to support this view. Second, Aviall maintains that even though the remedial investigation was complete when it first contacted the landowners, it would still have considered any landowner's request for additional investigation or testing, but no requests were made.

As an initial matter, the court rejects Aviall's implicit

premise that public participation is not required at the remedial investigation stage if there is a subsequent opportunity for participation. The court reaffirms the holding of *Aviall III* that investigatory costs, like other response costs, are recoverable under CERCLA only if they are consistent with the NCP. *See Aviall III*, 572 F.Supp.2d at 697-98. This includes consistency with the NCP's public participation requirement. *See id.* (discussing Forest Park) ("Accordingly, because Aviall has not shown that it achieved the NCP's purpose of allowing all parties who might foreseeably be affected to participate in the response at Forest Park (*including the investigation*), Aviall's attempt to recover investigatory costs must also fail." (emphasis added)).

Moreover, a reasonable trier of fact could not find that Aviall gave the 12 downgradient landowners an equivalent opportunity to protect their interests and influence Aviall's decisions. Aviall's assistance in obtaining IOP certificates was not a substitute for the opportunity to comment on, and possibly to influence, an ongoing remedial investigation. The IOP certification process did not afford the landowners an avenue to express, and Aviall to consider, their views on the nature, duration, and extent of the investigation.

Nor is the court persuaded by Aviall's second argument. Although Aviall posits that it would have taken into account a landowner's request for additional testing or investigation, Aviall

cites no evidence that indicates that the landowners were aware of this purported opportunity. Rather, a reasonable trier of fact could only find that the letters that Aviall sent to the landowners gave the impression that the investigation was closed. *See*, *e.g.*, D. App. 267 (letter to Amlie LTD) ("[Aviall] *has conducted* an environmental investigation[.] (emphasis added)). An unknown opportunity to participate cannot be a meaningful one.

Because Aviall failed to provide foreseeably-affected parties with a meaningful opportunity to participate in the Love Field remedial investigation, it did not substantially comply with the NCP's public participation requirement.[4] Although it may appear unfair to excuse Cooper from paying for this tranche of the cleanup costs at Love Field, this result flows from Congress' policy judgment to limit CERCLA's remedy to costs that are consistent with the NCP. *See PMC, Inc. v. Sherwin-Williams Co.*, 1997 WL 223060, at *10 (N.D. Ill. Apr. 29, 1997) ("Congress chose . . . to create a detailed regulatory scheme and decided to make adherence to the regulatory scheme more important than making CERCLA an unlimited vehicle for cleanup cost recovery." (internal quotation marks and alteration omitted), *vacated in part on other grounds*, 151 F.3d 610, 620 (7th Cir. 1998)).

---

[4]Based on this holding, the court need not consider whether the recreational users of Bachman Lake were foreseeably-affected parties or whether (as Aviall argues) the TNRC's involvement adequately protected their interests.

Accordingly, concerning Aviall's Love Field remedial investigation costs incurred for the period March 1996 through February 1997, the court grants Cooper's motion for summary judgment and denies Aviall's motion.

III

The court now turns to Aviall's response costs for cleaning up Carter Field.

A

Aviall discovered groundwater contamination at Carter Field through the May 1996 due diligence assessment of Greenwich, the prospective purchaser of the property. Aviall reported the contamination to the TNRC and commenced an investigation. Greenwich's due diligence assessment had detected chlorinated contaminants in at least two monitoring wells located at the Carter Field site and one monitoring well on adjacent land owned by Centreport. Aviall's investigation, however, indicated that the contamination was limited to just one monitoring well at the Carter Field site. Aviall's investigation produced two reports, one that summarized investigative results and one that proposed closure of the response action through a deed certification that alerted potential purchasers to the presence of groundwater contamination. Aviall submitted these reports to the TNRC, Greenwich, and (Aviall maintains) to Centreport. The TNRC approved closure through deed certification and did not require Aviall to take further action to

remove or remediate the contamination. Aviall forwarded a draft deed certification to the TNRC and Greenwich, and the final version was recorded in Tarrant County in August 1997. During the Carter Field response action, Aviall also communicated with Cooper regarding the costs incurred and proposed closure.

B

As with Love Field, the parties' Carter Field arguments center on limning the scope of foreseeably-affected parties. Aviall maintains that Greenwich and Cooper constituted the only foreseeably-affected parties. It contends that, because the contamination was contained within Carter Field's boundaries, no other landowner, including Centreport, could have been foreseeably affected.[5]

Cooper responds that not only Centreport, but at least one additional adjacent landowner, was foreseeably affected by Aviall's

---

[5]Alternatively, assuming that Centreport was a foreseeably-affected party, Aviall contends that Centreport had a meaningful opportunity to participate in the response action because Aviall provided Centreport with its two investigative reports. Cooper responds that Aviall has cited no evidence that it ever forwarded these reports to Centreport, and it moves for summary judgment on this ground.
　　Although the cover letters accompanying Aviall's investigative reports do not explicitly indicate that copies were transmitted to Centreport, these letters do contain "bcc" designations with names listed. *See* P. App. 518, 5077. Viewed favorably to Aviall as the summary judgment nonmovant, this evidence would permit a reasonable trier of fact to find that one of the listed persons represented Centreport. Assuming that Centreport is a foreseeably-affected party, therefore, the court declines to grant Cooper's motion for summary judgment on the ground that Centreport did not have a meaningful opportunity to participate.

response action. Cooper argues, and cites supporting expert opinion evidence, that the presence of contamination on one property creates "environmental stigma" that tends to depress the market values of surrounding, uncontaminated properties. *See* D. App. 515-16. Cooper therefore contends that Aviall's neighbor located adjacent and downgradient to the East was a foreseeably affected party.

To controvert Cooper's "environmental stigma" argument, Aviall cites an expert article that opines that it is unwarranted to assume that environmental contamination reduces property values and that such conclusions must be based on supportive market data. Aviall therefore reasons that the risk that the Carter Field contamination would depress nearby property values was merely speculative rather than foreseeable. Environmental stigma, in Aviall's view, is too tenuous a theory by which to define foreseeably affected parties.

C

Because it is undisputed that Aviall never informed the eastern, downgradient landowner of the Carter Field response action, the court considers whether a reasonable trier of fact could find that this party was foreseeably affected. The court rejects Aviall's theory that the class of foreseeably affected parties is limited to those whose properties are likely actually to be contaminated. The concept of "foreseeably affected" is not

coterminous with "foreseeably contaminated."  Rather, it is broader.  *See Aviall III*, 572 F.Supp.2d at 696 (listing "someone whose property has been contaminated" as one example of a foreseeably affected party).  Therefore, the fact that contaminants had not migrated onto the eastern neighbor's land does not preclude the determination that the neighbor was foreseeably affected.

The court concludes that the evidence, including the opinion of Cooper's expert, would permit a reasonable trier of fact to find that the eastern, downgradient landowner was a foreseeably-affected party.  It is not unduly tenuous or speculative to hypothesize that the landowner's property value could be negatively impacted.  Because a search of public property records of nearby properties would uncover Aviall's deed certification, the eastern landowner could foreseeably be concerned that potential buyers would be deterred at least by the possibility that migrating contamination had seeped onto the property.  Moreover, the court has already credited the theory that property value decline may be a foreseeable effect.  *See id*. (discussing Forest Park) ("Another way in which a neighboring landowner might be affected by a cleanup is through the loss (or recovery) of property value.").

The court also holds, however, that a reasonable trier of fact could find that the eastern landowner was *not* a foreseeably affected party.  Given the limited extent of the contamination at Carter Field—primarily limited to one well—a reasonable trier of

fact could find that the risk of property value decline in these circumstances was simply too remote to render the eastern neighbor foreseeably affected. *Cf*. *id*. at 695 (reasoning that evidence that "might demonstrate that the neighboring properties of a particular site would not lose value as a result of a particular response action" may assist the trier of fact).

Accordingly, the court denies Cooper's motion for summary judgment as to the Carter Field response costs.

D

Having denied summary judgment for Cooper, the court now considers Aviall's motion for partial summary judgment as to CERCLA liability regarding Carter Field.

As the court explained in *Aviall III*, 572 F.Supp.2d at 688-89, and reiterates above, *see supra* at § I, when a plaintiff's § 107(a) claim is not dismissed on summary judgment for failure to substantially comply with the NCP, the plaintiff can obtain partial summary judgment on liability, leaving the question of substantial compliance for adjudication at trial.

Aviall is entitled to partial summary judgment establishing Cooper's liability under CERCLA if it proves:

> (1) that the site in question is a "facility" as defined in § 9601(9); (2) that the defendant is a responsible person under § 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs.

*Aviall III*, 572 F.Supp.2d at 700 (quoting *Amoco Oil*, 889 F.2d at 668). Aviall must establish each of these elements beyond peradventure. *Id.* Cooper concedes that Carter Field is a "facility" under § 9601(9), *see* P. App. 15, and it does not dispute the other three elements.

Accordingly, the court grants Aviall's motion for partial summary judgment on Cooper's CERCLA liability for Carter Field.

\* \* \*

For the reasons stated in *Aviall III* and today's opinion, the court grants in part and denies in part Cooper's November 14, 2005 motion for summary judgment, and grants in part and denies in part Aviall's November 14, 2005 motion for partial summary judgment.

**SO ORDERED.**

February 27, 2009.

                                              SIDNEY A. FITZWATER
                                              CHIEF JUDGE